Jerry Lovett was indicted and convicted for the murder of his wife, Ann Jones Lovett. Sentence was twenty-three years' imprisonment. Three issues are raised on this appeal of that conviction.
 I
Mrs. Lovett was killed by a .12 gauge shotgun blast which struck her in the chest. At trial, five photographs of Mrs. Lovett's body at the scene of the crime were admitted into evidence. Four of these photographs were admitted over the defendant's objection that they were cumulative and of no probative value. Each photograph depicts a slightly different angle of view of Mrs. Lovett.
These photographs were properly admitted into evidence. C. Gamble, McElroy's Alabama Evidence § 207.01 (2) (3d ed. 1977). "Photographs depicting the character and location of external wounds on the body of the deceased victim are admissible even if they constitute cumulative evidence based upon an undisputed matter." Hines v. State, 365 So.2d 320, 321 (Ala.Cr.App.), cert. denied, 365 So.2d 322 (Ala. 1978).
 II
A note written by Mrs. Lovett approximately seven hours before her death was admitted into evidence as falling within the res gestae exception to the hearsay rule.
The State's evidence shows that the defendant and his wife "argued a lot" especially when the defendant had been drinking. About one month before the murder, the defendant had threatened his wife with a shotgun and told her, "If you don't think I will kill you, you watch me and I will get away with it too." The defendant and his wife had "gotten into it Christmas night" when the defendant had "bruised" his wife, giving her two black eyes and a swollen nose.
The events leading up to the murder actually began during the day of December 31, 1984, when the defendant started drinking. Mesha Dawn Lovett, the twelve-year-old daughter of the defendant and his wife, testified that that night she was scared because the defendant "had the guns out and I was afraid that he would shoot her [Mrs. Lovett] with it."
At 3:50 on the morning of January 1, 1985, Mesha saw her mother writing a note which stated:
 "Here I am 1-1-85 at 3:50 A.M. in the morning, I haven't had a bit of sleep tonight. Jerry [the defendant] has kept me awake all night long going in and out of the house cursing, talking crazy, and doing stupid and foolish things.
 "He falls on the furniture, hits things with his fist and gets the guns out and does all kinds of weird things. I am truly afraid that he may hurt one of us especially."
This note was admitted over the objection of defense counsel that it was "hearsay". Mesha testified that the defendant "turned off the power" at 3:50 that morning and she went to sleep.
Shane Lovett, the seventeen-year-old son of the defendant and his wife, returned home around 8:30 on the morning of January 1, 1985, after a date. Although no one *Page 1036 
was up in the house, he heard his parents talking in their bedroom. Shane went to bed and the next thing he remembers is his mother "talking to me and telling me that daddy was falling on everything in the house and had been drinking and had the guns out. And she said she was going to leave him."
Later, Shane was awakened by his mother's scream and by Mesha, who told him that "daddy has got them guns out." Before Shane reached his parents' bedroom, he heard a gunshot. He found his father next to his mother, who had been shot and was lying in bed. The defendant handed Shane the shotgun and told him to shoot him. The defendant also handed Shane $500 and told Shane that he and Mesha "were going to need it." This occurred shortly after 10:00 that morning.
"Statements and declarations of a deceased are not competent evidence for or against an accused in a murder prosecution unless made in his presence, or unless they are admitted in evidence as part of the res gestae or constitute dying declarations." Hargrove v. State, 368 So.2d 335, 337
(Ala.Cr.App. 1979). On a trial for murder, a conversation between the decedent and another, before the killing and not part of the res gestae and had while the accused was absent, is inadmissible. Holland v. State, 162 Ala. 5, 11, 50 So. 215,217-18 (1909). See also Jones v. State, 174 Ala. 53, 62,57 So. 31, 34 (1911) (evidence of what deceased told a witness several hours before the killing as to how he received certain other wounds from which he was then suffering was inadmissible).
 "It is widely recognized that the statements of the victim of a homicidal act which are closely enough linked thereto in time and circumstance may be admissible in evidence under the res gestae exception to the hearsay rule. Utterances of the deceased, if otherwise within the rules permitting proof of the res gestae, are admissible, whether made before or after the homicidal act, provided the interval of time between the act and the declaration is not so long that the utterance cannot reasonably be said to have been spontaneous. To be admissible as res gestae, the declaration of a deceased person must have been made at such a time and under such circumstances as to be a part of the transaction which they purport to explain, although they need not have been made under the sense of impending death. . . .
 "Under some circumstances, the accusatory utterance of the victim has been admitted when expressed in writing or by signs or gestures." 40 Am.Jur.2d Homicide § 334 (1968).
The question presented in this case is whether the note written by the defendant's wife seven hours before her death was properly admitted into evidence as coming within the res gestae exception to the hearsay rule.
In this case, we are reluctant to characterize the note as falling within the res gestae exception for a number of reasons. "`It is difficult, if not impossible, to accurately define the principle of res gestae.'" Bessierre v. AlabamaCity, G. A.R.R. Co., 179 Ala. 317, 330, 60 So. 82, 86 (1912). See also Harrison v. Baker, 260 Ala. 488, 493, 71 So.2d 284,288-89 (1954). On res gestae and the hearsay rule see E. Clearly, McCormick on Evidence § 288 et seq. (3d ed. 1984). Our own Supreme Court has stated:
 "Facts or declarations to be admissible under the principle of res gestae must be substantially contemporaneous with the main fact under consideration and so closely connected with it as to illustrate its character, Dudley v. State, 185 Ala. 27, 64 So. 309; Jackson v. State, 177 Ala. 12, 59 So. 171; Moss v. State, 190 Ala. 14, 67 So. 431. It is true, however, that where there is an unbroken chain of events beginning with a prior difficulty and leading up to the killing, the chain of events leading up to the killing need not be a part of the res gestae in the sense that these events became a part of the crime itself, but they are admissible since they lead up to and tend to explain the acts, animus or intent of the defendant at *Page 1037 
the time he committed the killing. Keith v. State, 253 Ala. 670, 46 So.2d 705; Smith v. State, 253 Ala. 220, 43 So.2d 821; Collins v. State, 138 Ala. 57, 34 So. 993, 994." Byrd v. State, 257 Ala. 100, 103, 57 So.2d 388, 390-91 (1952).
"For a statement made by parties at the scene of a crime to be admissible as a part of the res gestae exception to the hearsay rule, it must be incident to what was done, and shed light on the main fact, and be instinctive and spontaneous, and not deliberative or restrospective." Williams v. State,389 So.2d 151, 153 (Ala.Cr.App.), cert. denied, 389 So.2d 154 (Ala. 1980).
Although "[t]ime alone is not a determining criterion when the question is whether a thing said or done is a part of a given transaction," Pope v. State, 174 Ala. 63, 80, 57 So. 245,251 (1911), "the lapse of time between the particular utterance and the event is generally regarded as of primary significance, there being a judicial reluctance to characterize statements as `spontaneous' as the length of time increases between the utterance and the event, especially if the utterance takes the form of a statement of belief in the defendant's deadly intention or a statement of fear of it." Annot., 74 A.L.R.3d 963, 965-66 (1976).
 "In Hawk's Case, 72 Ala. 112, 117, 118, 47 Am.Rep. 403, it is said: `It is difficult, if not impossible to accurately define the principle of res gestae as it is often called. It is commonly said to have reference to such circumstances and declarations as are contemporaneous with the main fact under consideration, and so closely connected with it as to illustrate its character. 1 Greenl. Ev. § 108. What lapse of time is embraced in the word "contemporaneous" is often a question of difficulty. Perfect coincidence of time between the declaration and the main fact is not, of course, required. It is enough that the two are substantially contemporaneous. They need not be literally so. The declaration must, however, be so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as to virtually constitute but one entire transaction, and to receive support and credit from the principal act sought to be thus elucidated and explained. The evidence offered must not have the earmarks of a device, or afterthought, nor be merely narrative of a transaction which is really and substantially past.'" Bessierre, 179 Ala. at 330-31, 60 So. at 86.
The cases in Alabama offer little guidance or precedential value in deciding whether or not the note falls within the res gestae exception, but serve mainly to illustrate the principle that "[w]hether testimony is part of the res gestae is a matter to be determined by the court on a case-by-case basis, and there is no hard and fast rule for making such a determination." Johnson v. State, 335 So.2d 663, 674
(Ala.Cr.App.), cert. denied, 335 So.2d 678 (Ala.), cert. denied, 429 U.S. 1026, 97 S.Ct. 649, 50 L.Ed.2d 629 (1976). Compare Jackson v. State, 177 Ala. 12, 15, 59 So. 171, 173
(1912) (a difficulty between the accused and the deceased six hours before the accused killed the deceased did not form any part of the res gestae); Webb v. State, 135 Ala. 36, 41,33 So. 487, 489 (1903) ("The inquiry extended to the whole night, . . . and therefore cannot be considered as relating merely to the res gestae of the homicide."); Rosenbaum v. State, 33 Ala. 354,361 (1859) (what occurred between the accused and the victim of an assault in the "forenoon" was "no part of the res gestae — was too far removed in point of time from the actual engagement" where the accused assaulted the victim around suppertime); Ford v. State, 33 Ala. App. 134, 135, 30 So.2d 582,583 (1947) ("The difficulty . . . originated in the home of State witness James Williams, and was a continuous transaction throughout to its conclusion. Therefore, under the law, everything that was said or done in connection therewith constituted the res gestae."); Pugh v. State, 30 Ala. App. 572,575, 10 So.2d 833, 835 (1942) (in a prosecution for carnal knowledge, the evidence showed one "continuous transaction" between the parties *Page 1038 
from the time the date began on the afternoon of one day until the following afternoon when the prosecutrix complained to her mother); Welch v. State, 28 Ala. App. 273, 279, 183 So. 879,884-85, cert. denied, 236 Ala. 577, 183 So. 886 (1938) ("The res gestae of the crime is not confined to the moment of the killing, but includes acts, statements, occurrences, and circumstances forming a part or a continuation of the main transaction, beginning with the defendant's arrival in Talladega [on June 16, 1936], and continuing through the days of the organization of the union and `Picket Line' up to and including the actual homicide [on July 22nd].").
Most of the note was merely a "retrospective narrative" of a past occurrence and, as such, was not included within the res gestae of the murder. Kiel v. State, 236 Ala. 585, 586,184 So. 210, 211 (1938); 22A C.J.S. Criminal Law § 662 (1) at 666 (1961). Also, "a declaration as to the mere belief of the declarant is not admissible when such belief is not a fact in issue." 22A C.J.S., supra, at 667.
However, even if the admission of the note into evidence constituted error, we find that any error was harmless for the reason that the contents of the note were merely cumulative to other evidence before the jury. Peterson v. State,452 So.2d 1372 (Ala.Cr.App. 1984); Bryars v. State, 456 So.2d 1122
(Ala.Cr.App. 1983), reversed, 456 So.2d 1136 (Ala. 1984).
The substance of the note was that the defendant was cursing, talking crazy, doing stupid, foolish, and weird things, falling on furniture, hitting things with his fist, and getting the guns out, and that Mrs. Lovett was afraid the defendant was going to hurt "one of us."
Mesha testified, without objection, that her father was drinking, "cussing and fussing," that he was "fooling" with his two guns, that he wanted to show her how to use them, and asked her did she enjoy where she slept. When Mrs. Lovett told the defendant to take the guns out of the house because she did not trust him with the guns inside, the defendant hid them outside and then accused Mesha of having hidden them. When the defendant retrieved the guns, they were dirty and muddy because it had been raining and he made Mesha clean them. Mesha was afraid her parents "would get into it." The defendant "threw the guns out again" and later woke up Mesha and made her go outside, find the one gun he had been unable to find, and then clean both guns a second time. Mesha testified that her father shot her mother. She testified that she was scared "[b]ecause he had the guns out and I was afraid that he would shoot her with it."
Mesha testified that she had seen her parents fighting on "numerous occasions" and that the defendant had threatened her mother on two prior occasions with a firearm, and had given her mother two black eyes and a swollen nose on Christmas night.
Shane Lovett testified, without objection, that his mother told him "that daddy was falling on everything in the house and had been drinking and had the guns out." He stated that his father shot his mother and then tried to shoot himself. Shane also testified to the previous arguments and fights his parents had had and stated that his father "would sit there and just half beat her [Mrs. Lovett] to death by the hair of the head holding her down beating her with his fists or slapping her or pulling her hair, and she would just be sitting there and screaming and I would be scared to go in there to fool with him."
We find that the admission of the note was harmless error since its subject matter was merely cumulative of other testimony to the same effect. See Peterson v. State,452 So.2d 1372, 1375-76 (Ala.Cr.App. 1984); Gullatt v. State,409 So.2d 466, 474 (Ala.Cr.App. 1981); Garner v. State, 53 Ala. App. 209,212, 298 So.2d 630, 631-32, cert. denied, 292 Ala. 721,298 So.2d 633 (1974); Brooks v. State, 45 Ala. App. 196, 202,228 So.2d 24, 29 (1969); Henderson v. State, 34 Ala. App. 554, 557,42 So.2d 475, 478, cert. denied, 252 Ala. 602, 42 So.2d 480
(1949). *Page 1039 
 III
The trial court refused the defendant's requested charge No. 28 which stated:
 "I charge you the jury that voluntary intoxication never justifies a person in commission of a crime except if such person was in such a state of extreme intoxication that he could not form criminal intent."
This is not a correct statement of the law because intoxication never justifies the commission of any crime. "Involuntary intoxication is a defense to prosecution if as a result the actor lacks capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." Alabama Code 1975, § 13A-3-2 (c) (emphasis added). "Voluntary drunkenness does not excuse crime, yet its excessiveness may produce such a mental condition as to render the intoxicated person incapable of forming a specific intent."State v. Massey, 20 Ala. App. 56, 58, 100 So. 625, 627 (1924). "Voluntary drunkenness is no excuse for homicide." R. Perkins, R. Boyce, Criminal Law p. 1006 (3d ed. 1982). "The rule is practically universal, and is supported by a vast number of cases, . . . that voluntary intoxication is no justification or excuse for homicide, or any other criminal act." F. Wharton,The Law of Homicide p. 805 (3d ed. 1907).
 "The principle is everywhere recognized, that voluntary drunkenness or intoxication is no excuse for the commission of crime. Roscoe's Cr.Ev. 985; 1 Arch.Cr.Pl. 11-14. This in nowise conflicts with the rule, that it may some times operate to rebut the existence of malice, so as to reduce the grade of the homicide, or other crime, of which malice is a necessary ingredient. So, in many instances, a man may be so drunk as to be incapable of forming or entertaining any specific intention at all. Mooney v. State, 33 Ala. 419; Ross v. State, 62 Ala. 225; 1 Russ. on Cr. 12-13. Yet it can not be said in any proper sense that the existence of intoxication excuses the crime committed under its influence, or that the defendant should on that account be entirely acquitted of guilt." Ford v. State, 71 Ala. 385, 395-96 (1882).
The trial court thoroughly instructed the jury on the correct legal principles involving intoxication as a defense. His refusal of charge No. 28, which improperly stated the law, was proper.
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.